Good morning, Your Honors. I'm sure I've got it wrong. What is the correct pronunciation? Mr. Guiye. Mr. Guiye. All right. Thank you. May it please the Court, my name is Stacey Scriven Bernstein, and I represent Petitioner Dama Guiye. At this time, I would like to request two minutes for rebuttal. Your Honors, this case is about slavery in one of the few countries in the world in which modern-day slavery has been extensively documented. The white Moors in Mauritania have enslaved black Africans for centuries, and it remains an integral part of Mauritanian society, with up to one million black Africans still enslaved. Counsel, I appreciate the fact that you are pro bono, and we really thank you very much for that. We depend greatly on excellent counsel to represent people who don't have their own lawyers, but I want to get to the heart of my concerns about the case here. The IJ, and later the BIA, focused on the fact that there's some real credibility problems with your client's story. He claimed at 18 he was taken into service by a white Arab, who he claims enslaved him. He claimed it was 10 years, but when you look at the years, it couldn't possibly be. It was 8 years at most. He then is sent on a very serious mission to collect $3,000, which in that setting is a lot of money, not something that a slave, in quotes, would normally be entrusted with. The country report says that over 30% of the population is black African. It also says that the slavery to which you make reference is almost exclusively practiced in remote villages, whereas your client testified that he was held in a city of some size. He claims that he left, I guess it was Somalia or wherever he left from to go to the United States. He said he was there for like 40 days or something like that, but he said he came to the United States. It took him 6 months. He had no explanation for what he did in between. In short, a classic problem of credibility. What do we do with that in this case? Your Honors, I don't believe you do anything with it, and this is why. The Board expressly assumed that Mr. Gay's story was credible and did not reach the issue of credibility. I think there are great explanations for why these inconsistencies, A, do not go to the Well, it is his only claim, isn't it? I mean, the reality is that you have to show that he is enslaved because of his race, so that gets him into a protected group. But the reality is he doesn't claim to have been tortured, he doesn't claim to have been jailed, he doesn't claim to have been beaten. All the things that we hear all the time, we don't have any of that. His sole claim, all of this stems from the idea that because he was a black African and somebody didn't pay him, I mean, it sounds like the governorship race in California. Because some rich person didn't pay him, that he's in a part of a protected class. Your Honor, our position is that 10 years of unpaid forced servitude is economic deprivation that rises to the level of persecution under our precedent. But wouldn't that cover most of the population of India, part of China, Malaya, most of the world, indeed? I'm not aware that individuals are held against their will and do not receive compensation in those countries, similar to Mr. Gay's circumstance. If I were to return to the issue of credibility, though, which I think is key. Okay, well, let's assume you're correct. Let's assume that it's not on the table. Let's focus on, then, the group. You do agree that everything in his claim stems from the fact that he claims to have been enslaved because he was a black African. Is that right? Yes. Okay. So he bears the burden of credibility there, right? And you're saying that that's all been assumed. But let's even assume that that is correct. Does that, in and of itself, without torture under the case law, equate to protection? Absolutely. This court recognized as early as 1969 in Kovach v. INS that economic harm alone can constitute persecution. And the board, similarly, has restated that general principle numerous times, most recently in INRI TZ, in which they adopted a two-part test under which either the showing of a deliberate imposition of severe economic harm or deprivation of basic necessities, such that life or freedom is threatened, is sufficient to constitute persecution. And I think it's important to look at Kovach in particular, because there the court was analyzing the amendments to the INA in 1965, where they removed the requirement that persecution be physical. And the court in Kovach held that the fact that they removed the requirement that and recognized the possibility that economic harm alone can constitute persecution. That really gets more to labor standards. Obviously, Mr. Gay must have been provided clothing, food, housing, else how would he have subsisted, right? Right. But I think... Does it have to be an economic? I mean, does it have to be cash? Does he have to be paid cash for his services? African-Americans in the United States were also provided food, clothing, housing. Yet, I don't believe we would argue that they were compensated fairly or that they had any economic opportunity. What about Mexican-American or let's say in this case Mexicans? They haven't been brought to the United States yet, but they're here harvesting crops. How does that fit? I think looking... Do they have claims under the statute? I'm not sure whether they would have claims under the statute. Well, I'll give you a hypothetical. Sure. Ten people come from Mexico. They want to work in the agricultural area of central California. They don't have visas. They're just there. They're provided with food, clothing, a place to sleep, work. And they're supposed to get paid. They don't get paid. Do they have a claim? They would have to show that the United States government was either unwilling or unable to control this persecution. So that's where you get to the real problem here, isn't it? Because your guy didn't report anything to the police, didn't report anything to the government. What evidence is there that the government knew of the existence of this alleged slave owner in the first place, let alone what he was doing? Two things, Your Honor. This court has repeatedly held that there is no freestanding reporting requirement. I believe we sent in a 28-J letter discussing Rahizma's, forgive me if I pronounce this wrong, Rahizma and Afri, in which they reiterated that a freestanding reporting requirement is not an element of our case law and that it simply leaves a gap in proof that the petitioner can fill with other forms of evidence, including evidence of generalized country conditions showing that the character and the pervasiveness of this type of persecution, that it's not well controlled. What does your client provide? I don't mean to dominate this conversation here, but what evidence has your client provided to meet that gap? He provided both evidence of generalized country conditions and in the remote areas, right? That's what the country report says. I will speak to that briefly. The country report does not say that it's limited to remote areas. The country report says that it persists particularly in remote areas and in the south. First, that does not indicate that it doesn't exist elsewhere. It just indicates that it persists most strongly in certain areas. And second, although this is an issue that would have been addressed with the board if they had actually reached the issue, Mr. Gay is from the south, which is one of the areas in which they say it persists most strongly. We haven't briefed that, but he does fit within that category. Even the State Department's own country reports acknowledge that incidents of slavery continue to occur and persist. One final question that I have anyway, and that is this man is a thief by his own admission. He stole a lot of money. What role, if any, should that play into his credibility that he was, in fact, held as a slave? I do not believe that escaping 10 years of unpaid forced servitude by taking money that was intended for him. Yeah, well, you're not answering my question. It couldn't have been 10 years, 8 years at the most. So let's say it's 8 years. This alleged slave master entrusted Mr. Gay to go to another country to collect $3,000 for him and bring it back. Mr. Gay stole the money. What role does that play in our analysis? Torture is never okay. Well, you're getting to the OLC, but that's not what we're talking about today. I don't believe, even to the extent that that might weigh adversely on his credibility, that wasn't the basis upon which the IJ held that he was not correct. Well, they talked about that. They talked about that that did affect his credibility. My recollection from reading that is that they relied in particular on the fact that the alleged date discrepancies and the fact that he described his city in his perspective as good-sized and the country reports indicated that it persisted most strongly in the south and the southeast. But to the extent that the IJ did rely upon that as a basis for its adverse credibility finding, the Board never reached that issue. And under the Ninth Circuit precedent, Mr. Gay is entitled to a presumption before this Court that his testimony is credible, along with all the reasonable inferences to be drawn from that testimony. And in many cases, this Court has the procedural posture of this case that we assume Mr. Gay is credible and we evaluate what the Board did on the basis of the grounds that they actually relied on. And here they committed two fundamental legal errors. They completely disregarded binding Ninth Circuit and Board case law, establishing that economic harm alone can rise to the level of persecution, and they impermissibly required Mr. Gay to establish a much higher standard of proof that the Mauritanian government was in fact behind his slavery, that his slavery was committed by or at the behest of the Mauritanian government. And that is not the correct legal standard. The correct legal standard is simply that the Mauritanian government was unwilling or unable to control. And due to these two fundamental legal errors, the Board's decision cannot stand and must be vacated and remanded for proper disposition under the correct legal standards. Thank you, Counsel. Good morning. Excuse me. Good morning, Your Honors. May it please the Court. My name is Anne-Maya Wendell. I represent the United States Attorney General. With all due respect, this case is not about slavery. This case is about the burden of proof and whether Petitioner satisfied it. The two questions presented in this consolidated matter are whether the record compels the conclusion that Petitioner satisfied his burden of proving that he qualified for withholding of removal and protection under the Convention Against Torture. The second question is whether or not the Board acted within its broad discretion in denying the motion to reopen. Here there are many pathetic circumstances that we can consider for Petitioner and Petitioner's Counsel has articulated some of them. Unfortunately, sympathy is not sufficient to satisfy or show compelling evidence that he qualified for the relief that is requested. There is numerous deficiencies. First of all, there's no presumption applicable here to establish that he has a clear probability of future persecution. He hasn't established past persecution. What's the principal difference between this case and the forced labor camps in Laos and Cambodia upon which we've granted relief in the past? Your Honor, the distinction is that Petitioner hasn't shown an individualized fear. He also has not established any... Let's talk about past persecution now, whether he's established some past persecution. In cases in Laos and Cambodia, we've had forced labor camps in which we found that that constituted the requisite past persecution so that the Petitioner was entitled to a presumption of a well-founded fear of future persecution. So what's the principal difference between those cases and this one? Your Honor, this one does not involve any kind of forced servitude, nor does it involve any kind of labor that was connected to a protected ground. Here... Well, first, let's take it one at a time. I mean, if you assume that the Petitioner is credible, as the BIA did, and we have to take them at his word, then why isn't this a case of forced servitude? Your Honor, the record establishes that, for one, Petitioner had engaged in an agreement with Mr. Sidi to pay him, and in turn, Mr. Sidi... Rather, Mr. Gay has never alleged that he wanted for anything. This is not a circumstance where there was a forced labor situation where it was such that he didn't have a prerogative or that there was such extreme treatment that he was persecuted. Here what we have is a situation where he was given clothing, shelter. He doesn't allege that he ever wanted for anything. Well, neither do the cases particularly in Laos and Cambodia. These people were put into forced labor camps. There's no allegation in many of the cases that they wanted for food or clothing. What's the principal difference? Your Honor, here Petitioner testified that there was no abuse while he was working for Mr. Sidi. He testified he also had looked for employment in different cities and that he settled down once he found out that he could engage in some sort of employment with Mr. Sidi. Moreover, here there's more freedom where, obviously, Mr. Gay was allowed to travel over 10 hours away to a different country in order to procure money for his employer.  I think it compels the conclusion that his treatment with Mr. Sidi involved some sort of persecution. Can I ask you this question following up on Judge Thomas' question? Of course, in the Laos-Cambodia situation, it was the government that was doing this. In this case, what evidence is there that the government was either aware of Mr. Sidi or anything about him or did nothing to try to remedy the problem if there was a problem? Your Honor, there is none, and that's part of one of the deficiencies in terms of his ability to satisfy his purpose. That has to be shown by him, right? Either that it would have been utterly useless to do so, and the government was aware, but it would have been utterly useless to do so, or that he did report it. None of those happened, did it? No, Your Honor, he did not report it. And the record indicates that there may be a problem in the country. There is a problem in the country. The country reports clearly establish that. Your Honor, the country reports also indicate that the government of Mauritania has made different efforts. Right, so the 1999 country report says a system of officially sanctioned slavery in which the government and society joined to force individuals to serve masters. They acknowledge that, right? They say that it does not exist, nothing that is sanctioned by the government. I guess here's my question more fundamentally, and this gets away from the merits of the evidence, and that is did the BIA really deal with the contention that this is a group that the government was unwilling or unable to control? I struggle with that because in the BIA opinion, it says that there was no proof that this occurred at the behest of the government, which isn't the correct legal standard, and that's not the argument I think that Petitioner is making. So on one hand, you could say, well, the BIA was speaking in shorthand. On the other hand, you could say the BIA really didn't address that issue and we need to send it back so it can address it in the first instance. Would you comment on that? Yes, Your Honor. Two points. First of all, the Board's decision generally covered it. It may not have addressed it specifically, but to the extent that the court is concerned about it, then it's a question of whether or not that violates due process or there's a lack of clarity on which to base a decision. Well, that's not a due process issue. Our case law says that if the BIA doesn't address the essential claim of the Petitioner, we don't decide it in the first instance usually. We send it back to the BIA so it can do so. So my question is, and I just want to understand the government's position, is what did the BIA do? How did the BIA address the contention that this was a group that the government was unwilling or unable to control? Your Honor, the Board, in the context of whether or not the country was able to control, I don't know if it needed to reach that issue. I think that it generally did, but it did not specifically address the issue. So don't we need to send it back so it can? No, Your Honor. I mean, our case law is just crystal clear on this point, that if you're raising an issue and the Board doesn't rule on it, we have to send it back. Your Honor, with respect, then, the court's case law also indicates that in order for Petitioner to establish that the record compels a contrary conclusion, he has to establish past persecution on account of a protected ground. In addition to that. This goes to the on account of problem. Now, I grant that they've got to show first that it qualifies as past persecution if we disagree with the Board on it. But if we disagree with the Board on that, the Board really hasn't come to grips with the on account of problem, argued by the Petitioner, has it? I'm not quarreling with you, but this is the point that concerns me about the BIA decision. Obviously, you didn't write it, but you have to defend it here. Yes, Your Honor. I understand Your Honor's concern, too. However, I would say that in terms of the nexus requirement, the on account of requirement contemplates not simply just whether or not the government was unable or unwilling to control, but also whether or not Petitioner has established that to the extent that there was any kind of forced employment that it was because of a protected ground, because of his race, as he asserts, or his ethnicity. He hasn't done so. So there's no need to even address the question of whether or not the court was. I gather, though, from what you're saying is if we get to the point in this case where we say that there has been past persecution on account of a protected ground, at least if you assume the Petitioner is credible, then if we got to the point about government action, required government action, we probably have to send that back. Your Honor, if. . . Because if we. . . I just want to. . . If the Petitioner survives the first two hurdles, then the third hurdle we probably have to send it back. Your Honor, those hurdles being the past persecution. . . Right. It was a persecution and was a persecution on account of a protected ground. As well as the clear probability, because notwithstanding, he would still have to establish clear probability. Did Mr. Gay offer any testimony of any kind about the government and its role? Your Honor, he indicated that there was discrimination that was prevalent. But that was the gist of his testimony. That was broad form discrimination. Yes, Your Honor. And the country reports, the country conditions materials, all actually can be construed in different ways, both to support Petitioner's position as well as our position. And when one applies the compelling or the substantial evidence standard applicable in this case, then it's not a question of whether or not the record can substantiate different positions, but rather whether the record requires that we reach this conclusion. What role, if any, should the theft by Mr. Gay of the money with which he was entrusted play in our deliberation? Your Honor, the money really doesn't bear on the claim unless the court were to find that there was some sort of clear probability or that he established a clear probability that there was some sort of possibility or clear probability he would actually be placed in prosecution. So the reason I ask that is because the IJ says it defies credibility in my view that an individual who was supposedly a slave would be sent to another country to collect such a large sum of money entirely on his own. The BIA did not specifically address that at all. But to your position, I gather you're agreeing with opposing counsel that that really doesn't play any role. Your Honor, I would say a couple of things in response. I wanted to also point out a few things in the record that further address that question, or at least I believe that they do. First of all, in terms of whether with him taking that money, if anything, it doesn't establish that he would be prosecuted because there's no evidence that, for one, it shows that his... Well, that would be future prosecution, right? Yes, Your Honor, but his employer allowed him to travel 10 hours away on his own. Secondly, there's no indication that his employer or anyone else is interested in him. He's been gone for over a decade. There's no evidence that there was any interest in him or that his employer is alive or would prosecute him. He indicated that there's a couple of times when he asked or three times when he asked for payment and to leave. And his employer responded, he told me to wait. He would give me money later, but he never would. That's at the administrative record at page 292. Moreover, there's no evidence that his employer is still alive. He testified that at the time that he left, his employer was sick and over 50 years old. The country condition materials show that the average life expectancy back during that time, it was that the person, a male, would be a little over 50 years old. Right, but if he establishes past persecution, that doesn't matter, does it? Yes, Your Honor, it does. Then it's a presumption of future persecution. The board didn't reach that, so we'd have to send it back anyway. That would be your argument on remand. Yes, Your Honor, but here, again, there is no compelling evidence of past persecution. So assuming that it would be different if there was the past persecution, but, again, there is no. The evidence here indicates more so that if a person is able to move about, he may feel like he has no other option, but there's no evidence linking his employer as forcing him to stay on. He chose to. He felt over the course of 10 years. Well, that wasn't his testimony. He said he felt that if he left the employer that he was going to be put in jail, and he reasonably feared that. I mean, you can say whether it's credible or not. The BIA assumed it was credible, so. And, Your Honor, that is actually based on his subjective thought. There's nothing that is in the record that actually supports or compels the conclusion that it's a reasonable statement. Yes, okay. We have your argument in hand. Thank you very much for your presentation today, and we'll give you two minutes for rebuttal. Thank you, Your Honors. Quickly, I just want to note on the credibility issue, I would call your attention to the following pages in the second administrative record, pages 108 to 114. Those are the arguments that his counsel made before the board regarding the adverse credibility finding, arguing that it was improper. And the second issue that I wanted to address was the by or at the behest of the Mauritanian government, and I wanted to emphasize that a case that is, I think, on all fours with this one is Ornelas v. Chavez. In that case, this court reversed the decision, sent it back to the board, because the board had held that the petitioner was required to show that the government would sanction his torture, as opposed to the correct legal standard, which was simply that the government would have to consent or acquiesce in the torture. And the court rejected the argument that it was errant word choice or harmless error, because words matter. It connotated a higher level of volition and approbation by the government than was permitted under the law. Similarly here, Mr. Gay is only required to show that the government would have been unable or unwilling had he reported. What was the case you just referred to? Ornelas v. Ornelas Chavez. It's 458 F. 3rd, 1052, 9th Circuit, 2006. What's the best evidence in this record that the government's unwilling or unable to control this type of activity? Absolutely. It's enslavement is commonplace, well-known, and not controlled by the government. Other individuals in slavery have made reports of similar incidents to no avail. The government has not actively tried to stop slavery and, in fact, has prosecuted individuals who are working to stop slavery. And with respect to evidence, with respect to Mr. Gay's situation in particular, he was enslaved by a wealthy, powerful white moor with connections to the government due to his social status, who could reach him even in Senegal had he stayed there and had the power to have Mr. Gay tortured and killed. Where does that evidence come from, that he had connections with the government and that he was able to influence what they did and so on? Absolutely. The connections to the government – I'm missing one of my pages here. Connections to the government are 2nd Administrative Record, page 220. He has power because he has money, so he has the connection with the government, but he doesn't work for the government. Because of his status, he has connection with the government. So because he's rich, he has connection with the government. Which is fully consistent with the evidence in the State Department Country Reports, which report that the white moors frequently – I don't know if they say frequently, but they had often discriminated on the basis of tribal and ethnic affiliation. Is your best argument that the BIA just blew the standard here? Yes. Thank you. Absolutely. Okay, counsel. Thank you for your arguments. Thank you for your pro bono representation. Well argued and well briefed. An interesting case, and we'll take it under submission.
judges: Hogan, Thomas, Smith M.